## LUCKENBACH STEAMSHIP COMPANY *v.* UNITED STATES.

No. 49. Argued December 4, 5, 1929.—Decided January 6, 1930.

*Mr. George A. King,* with whom *Messrs. William B. King* and *George R. Shields* were on the brief, for petitioner.

*Assistant Attorney General Sisson,* with whom *Solicitor General Hughes* and *Messrs. George C. Butte,* Special Assistant to the Attorney General, and *Louis R. Mehlinger* were on the brief, for the United States.

Opinion of the Court by MR. CHIEF JUSTICE TAFT, announced by MR. JUSTICE VAN DEVANTER.

This was a suit in the Court of Claims by the Luckenbach Steamship Company, petitioner, against the United States to recover $30,370.94 claimed by the petitioner as a balance due for transporting mails of the United States, in steamships of United States registry, between ports of the United States and ports in the Canal Zone, from December 1, 1925, to June 30, 1926. Judgment went against the petitioner, 66 C. Cls. 679, and a petition to this Court for a review on certiorari was granted.

That the petitioner rendered the service stated and did so at the request of the Postmaster General is not questioned. The only matter in dispute is the true measure of compensation. The Postmaster General allowed the sum of $82,851.62 and transmitted approved vouchers therefor to the General Accounting Office for direct settlement; but that office reduced the allowance to $52,480.68 and caused this reduced sum to be paid to the petitioner. Thereupon suit was brought for the balance.

The Postmaster General in making his allowance proceeded on the theory that the compensation was to be determined according to § 4009 of the Revised Statutes; but the General Accounting Office regarded that section as inapplicable. If the section was applicable, the Post-

master General's allowance was right and should have been given effect by the Court of Claims.

Section 4009, which originally was part of the Act of June 8, 1872, c. 335, § 269, 17 Stat. 316, consolidating and amending the statutes relating to the Post Office Department, reads as follows:

" Sec. 4009. For transporting the mail between the United States and any foreign port, or between ports of the United States touching at a foreign port, the Postmaster-General may allow as compensation, if by a United States steamship, any sum not exceeding the sea and United States inland postage; and if by a foreign steamship or by a sailing-vessel, any sum not exceeding the sea-postage, on the mail so transported."

The specific point of difference between the Postmaster General and the General Accounting Office was that the former treated the ports in the Canal Zone as foreign ports within the meaning of that section, while the latter regarded them as domestic ports.

The rights possessed by the United States within the Canal Zone were acquired from the Republic of Panama under the treaty of November 18, 1903, 33 Stat. 2234. The Zone has a width of ten miles and extends across the Isthmus of Panama and into the sea at either end for a distance of three marine miles from mean low water mark; but the cities of Panama and Colon and the harbors adjacent to them, although within the outer boundaries of the Zone, are expressly excepted therefrom by the second article of the treaty.

Whether the grant in the treaty amounts to a complete cession of territory and dominion to the United States or is so limited that it leaves at least titular sovereignty in the Republic of Panama, is a question which has been the subject of diverging opinions [1] and is much discussed in the

[1] 20 Am. Journal International Law, pp. 120–122; Isthmian Highway, Miller, p. 221; *Wilson* v. *Shaw*, 204 U. S. 24, 32–33.

briefs. But for the purposes of this case the construction of the treaty in that regard need not be examined as an original question;—and this because a long continued course of legislative and administrative action has operated to require that the ports in the Canal Zone be regarded as foreign ports within the meaning of § 4009.

By the Act of March 2, 1905, c. 1311, 33 Stat. 843, which came within less than two years after the treaty, Congress declared that the laws regulating the importation of merchandise and the entry of persons into the United States from foreign countries should apply to and control the importation of merchandise and the entry of persons from the Canal Zone into any State or Territory of the United States or the District of Columbia; and on September 8, 1909, 27 Op. Atty. Gen. 594, the Attorney General, in an opinion given to the Secretary of War, held that the Canal Zone was not a possession of the United States within the meaning of the Tariff Act of August 5, 1909, c. 6, 36 Stat. 11, imposing specified rates of duty upon various articles when imported from a foreign country into the United States or " into any of its possessions."

In 1911 the Postmaster General, being authorized by an Act of March 3, 1891, c. 519, 26 Stat. 830, to arrange for the transportation of mails in American steamships between ports in the United States and foreign ports, submitted to the Attorney General the question whether, as respects mails largely intended for the cities of Colon and Panama, it would be within the letter and spirit of that Act to arrange for the carrying of such mails from the ports of New York and San Francisco to the government docks at Cristobal and Balboa in the Canal Zone. The Attorney General responded in the affirmative, saying, 29 Op. Atty. Gen. 194, 196:

" It appears from the papers transmitted by you that it will be more convenient for the vessels contracting for

this mail service to use principally the Government docks, which are being constructed at Cristobal on the Atlantic side and Balboa on the Pacific side; and the question arises whether by using these docks, which are in close proximity to but outside the limits of the cities of Colon and Panama and within the Canal Zone, the vessels would be carrying mails to foreign ports. It is stated in this connection that docking the large vessels at the cities of Colon and Panama would result in serious loss of time, and that the actual call at these places could be obviated by the use of a tender to meet the vessels upon entering the 'harbor adjacent to these ports' to receive and deliver the mail in Colon and Panama, the vessels then proceeding to the Government docks at Cristobal and Balboa.

"It has been held that the purpose of the act of March 3, 1891, is 'to promote the carriage of the ocean mails in ships of American register, and thereby to promote ocean commerce in American bottoms,' and that this statute, 'designed to promote foreign commerce, is entitled to a liberal construction, with a view of carrying out the purpose of its enactment.' (20 Op. 98, 101.)

"In my opinion, the service proposed is in substantial compliance with the letter and spirit of the statute, as being between 'ports of the United States' and 'ports of foreign countries.' The word 'port' is not limited in its application to the city which bears the same name, but has been defined as including the entire harbor, within its inclosures and projections of land, where ships take refuge and seek shelter. [Citing authorities.] Construing the word 'port' as synonymous with 'harbor' the vessels unquestionably would be carrying the mails to a foreign port if they entered the harbor, since the treaty reserves to Panama not only the cities of Panama and Colon, but also 'the harbors adjacent to said cities.' In any event, I think that carrying the mails upon such vessels within

such close proximity to said cities that they might safely be landed in a small boat would be a substantial compliance with the terms of the act."

By § 12 of an Act of August 24, 1912, c. 390, 37 Stat. 569, Congress, while extending to the Canal Zone the laws of the United States relating to extradition and the rendition of fugitives from justice, declared that for such purposes, " and such purposes only," the Zone should be treated as an organized Territory of the United States, and by § 9 of an Act of August 21, 1916, c. 371, 39 Stat. 529, Congress provided that the laws of the United States relating to seamen of vessels of the United States when " on foreign voyages " should apply to the seamen of all vessels of the United States when in the Canal Zone.

In 1925, the Department of Labor, construing a provision in the Immigration Act of February 5, 1917, c. 29, 39 Stat. 874, relating to seamen on board vessels arriving in the United States from " any foreign port or place," ruled that the ports in the Canal Zone should be deemed foreign ports in the sense of that Act, Par. 4, Rule 6, Immigration Laws and Rules of 1925; and in 1926 the Comptroller General held that, as ports in the Canal Zone are considered foreign ports in the absence of special provision to the contrary, an alien seaman shipping on an American vessel from a port in the Canal Zone is limited in the matter of relief to such as may be extended to an alien seaman shipping on an American vessel from a foreign port. 5 Dec. Comp. Gen. 647.

True, there have been instances in which Congress specially provided that for particular purposes the Canal Zone should be treated as a Territory or possession of the United States. This is illustrated in the provision already cited relating to extradition and the rendition of fugitives from justice, and in the acts relating to the liability of carriers by railroad for injuries suffered by their employes,

c. 149, 35 Stat. 5, to espionage, c. 30, title 13, 40 Stat. 231, and to sabotage, c. 59, 40 Stat. 533. But the purposes for which these special provisions were made were such that nothing was subtracted thereby from the force of the provisions before mentioned wherein, for purposes connected with importation, immigration and ocean transportation between the United States and the Canal Zone, Congress required that ports in the latter be regarded as foreign ports.

For a period of years and continuously to December 1, 1925, the Postmaster General tendered to the petitioner and the latter accepted for transportation in American steamships, and so transported for the United States, large quantities of mail between the United States and ports in the Canal Zone; and for this service the petitioner was paid the compensation intended by § 4009,—the Postmaster General and the accounting officers treating the ports in the Canal Zone as foreign ports in the sense of that section.

The service just described was continued without break into and through the period here in controversy—December 1, 1925, to June 30, 1926—and the Postmaster General, still treating the Canal Zone ports as foreign ports, allowed the same compensation as before. For this period, and this alone, the accounting officers declined to regard those ports as foreign ports. The service was continued after the period in question and for this later service the Postmaster General and the accounting officers concurred in allowing the compensation intended by § 4009, the accounting officers resting their assent upon an Act of Congress of July 3, 1926, c. 793, 44 Stat., Part 2, 900.

It thus appears, as was said by the Postmaster General in a letter of July 23, 1926, to the petitioner, that the Post Office Department from the outset and continuously up to and through the period in question " considered

the service to the Canal Zone as being in the same category as that to a foreign country " and approved compensation vouchers on that basis.

This recitation of pertinent legislative and administrative action demonstrates that this case is one in which we should apply the rule announced in *United States* v. *Alabama Southern R. Co.*, 142 U. S. 615, 621, where it was said:

" We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit. It is a settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced."

Our conclusion also has obvious support in the Act of July 3, 1926, *supra*, whereby § 4009 was reënacted in a form which undoubtedly puts ports in the Canal Zone on the same plane as foreign ports for the purposes of that section. The committee reports relating to that enactment show that it was particularly designed to meet and avoid the adverse ruling of the General Accounting Office, and to continue the prior course of action respecting the measure of compensation to be paid for carrying mails between the United States and the Canal Zone; that it was intended to recognize, as the prior practice did, that for " all practical purposes " such mails " are foreign mails "; and that the purpose of the act was not to

alter the rates paid to American ships, "but to clarify the law." House Report No. 1305, 69th Cong., 1st Sess.; Senate Report No. 1096, 69th Cong., 1st Sess.; House Report No. 1788, 70th Cong., 1st Sess.; Annual Report Postmaster General, 1927, p. 46.

We hold, therefore, that on the findings of ·the Court of Claims set forth in the record, judgment should have been given the petitioner for the balance of $30,370.94.

*Judgment reversed.*