**C. W. BRENNAN, Appellant,**

v.

**Stewart L. UDALL, Secretary of the Interior, Appellee.**

**No. 8722.**

United States Court of Appeals
Tenth Circuit.

June 22, 1967.

Fred M. Winner, of Winner, Berge, Martin & Camfield, Denver, Colo. (John J. Wilson, of Whiteford, Hart, Carmody & Wilson, Washington, D. C., William S. Livingston, John D. Knodell, Denver, Colo., and William E. Rollow, Washington, D. C., with him on the brief), for appellant.

S. Billingsley Hill, Atty., Dept. of Justice, Washington, D. C. (Edwin L. Weisl, Jr., Asst. Atty. Gen., Lawrence M. Henry, U. S. Atty., and David I.

Shedroff, Asst. U. S. Atty., with him on the brief), for appellee.

Before PICKETT and SETH, Circuit Judges, and CHRISTENSEN, District Judge.

PICKETT, Circuit Judge.

The appellant Brennan owns 160 acres of land in Rio Blanco County, Colorado, which, after having been classified as a valuable source of petroleum and nitrogen, was in 1917 patented to George H. Baxter, reserving to the United States "all the nitrate, oil, and gas in the lands", as required by 30 U.S.C. §§ 121–123.[1] In 1963 Brennan, together with Humble Oil and Refining Company, holder of an option to purchase the land, petitioned the Director of the Bureau of Land Management for a decision that oil shale was not included in the reservation. The Director, with the approval of the Assistant Secretary of the Interior, held: "It is clear that it was the intention of the parties to allow patent by reserving the oil shale to the United States and that the appropriate reservation of 'oil and gas' includes oil shale." Thereupon Brennan brought this suit seeking a review of the administrative determination, a declaratory judgment, and an injunction restraining the Secretary of the Interior from asserting any claim adverse to the ownership of Brennan in the oil shale deposits in the land. The United States District Court for the District of Colorado held that the reservation included oil shale and denied the relief sought. Brennan v. Udall, 251 F.Supp. 12. We affirm.

It is the basic contention of Brennan that the reservation authorized by the 1914 statute and that contained in the patent does not include "oil shale." The crux of the argument is that the term "oil", as used in mineral land statutes and in the Baxter patent, refers to a liquid hydrocarbon mineral capable of migrating in its natural form and does not embrace a deposit of oil shale, which is a solid mineral containing no oil, although petroleum may be produced by a process of destructive distillation which converts organic materials in the rock into liquid. The Secretary admits that the term "oil" ordinarily defines a liquid, while oil shale is a rock usually of an origin different from that of oil and is composed of a mixture of compounds which are insoluble in oil solvents.[2] It is conceded that oil shale as a rock, unlike coal, has little intrinsic value. Its value at the time of the classification in 1916, and now, is solely as a possible source of oil. The Secretary states that the real distinctions between oil in liquid form and oil shale are the mode of

1. 30 U.S.C. § 121 provides:

"Lands withdrawn or classified as phosphate, nitrate, potash, oil, gas, or asphaltic minerals, or which are valuable for those deposits, shall be subject to appropriation, location, selection, entry, or purchase, if otherwise available, under the nonmineral land laws of the United States, whatever such location, selection, entry, or purchase shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable, together with the right to prospect for, mine, and remove the same; but no desert entry made under the provisions of this section and sections 122 and 123 shall contain more than one hundred and sixty acres. All applications to locate, select, enter, or purchase under this section shall state that the same are made in accordance with and subject to the provisions and reservations of the above-mentioned sections. July 17, 1914, c. 142, § 1, 38 Stat. 509."

2. The parties stipulated:

"Petroleum, oil shale and coal are all hydro-carbon mixtures, usually containing other elements, such as sulphur, nitrogen and oxygen. The organic materials in oil shale called 'kerogen', as well as the organic materials in coal, are largely insoluable in oil solvents, such as benzine, ether, etc., while petroleums are essentially completely soluble therein. Each of these mixtures is a mixture of compounds, each compound having an individual chemical formula, but none of the three groups has a specific formula. However, although oil, oil shale and coal may contain the same elements, they are not chemically combined in the same manner in the three substances."

occurrence and the method of recovery, which accounts for Congress and the Department of the Interior treating them, on some occasions, as separate and distinct. The Secretary contends that from the time of the enactment of the 1914 statute, the Department of the Interior has treated the term "oil" as used in the statute and in the patent reservations as including oil shale, that Congress has taken no action affecting this treatment, and that under these circumstances the courts should accept the Department's determination.

There is little, if any, dispute in the material facts. During the year 1907 Baxter entered upon the land involved here and in 1909 made a formal homestead filing. At the time of entry and filing, the land was considered non-mineral and so designated by Baxter in his filing. The 1914 statute authorized agricultural entry upon mineral lands, but required a reservation to the United States of the minerals named therein. On May 23, 1916 the Director of the Geological Survey notified the Commissioner of the General Land Office of the great potential for petroleum in the oil shale deposits of Colorado, Utah, and Wyoming, and accordingly classified the tracts, including the Baxter entry, as mineral lands "valuable as a source of petroleum and nitrogen, * * *."[3] Shortly thereafter, following the instructions of the Commissioner, the local land office noted the classification on their tract books. On November 22, 1916, Baxter was advised that the date for the taking of final proof in connection with his homestead entry had been fixed, and enclosed was a form designated as a "Petroleum Waiver." The waiver provided:

"I, * * * hereby apply to have my entry considered as made under the Act of July 17, 1914 (38 Stat. 509) and hereby consent that the patent issued to me thereunder shall contain the provisions, reservations, conditions and limitations of the said act."

Baxter executed the waiver and the patent issued shortly thereafter. Nothing further occurred concerning the reservation until the aforesaid request to the Director of the Bureau of Land Management in 1963.

■ At the outset, the Secretary challenges the jurisdiction of the court because the relief sought seeks to diminish the title of the United States in the lands, consequently it is a necessary party and has not consented to be sued. We agree with the trial court that the decision of the Secretary of the Interior adversely affects Brennan's title to the land in question and is reviewable under the Administrative Procedure Act. 5 U. S.C. § 1009, (now §§ 701–706). Coleman v. United States, 9 Cir., 363 F.2d 190, 191; Adams v. Witmer, 9 Cir., 271 F.2d 29; Denison v. Udall, D.C. Ariz., 248 F.Supp. 942; Stewart v. Penny, D.C.Nev., 238 F.Supp. 821. Cf. Homovich v. Chapman, 89 U.S.App.D.C. 150, 191 F.2d 761.

The Department of the Interior's determination that oil shale should be reserved under the 1914 Act was first disclosed by the 1916 classification which was based exclusively upon the findings of the geological survey that the oil shale deposits of Colorado, Utah and Wyoming were valuable as a source of petroleum and nitrogen. On May 10, 1920, the Secretary of the Interior advised the Commissioner of Public Lands that oil shale was accepted as prima facie evidence of the value of lands classified for mining purposes, so as to require an agricultural entryman to accept restricted patents under the provisions of the 1914 Act. 47 L.D. 548. To the same effect was the decision of Dennis et al. v. State of Utah, 51 L.D. 229 (1925). In 1927 the Department recognized that a valid mining claim to oil shale deposits could be made on lands where the homestead patent had reserved to the United States the "oil and gas." James W. Bell, 52 L.D. 197. See also Smallhorn Oil Shale Refining Co.

---

3. The duties of the Director of the Geological Survey are set forth in 43 U.S.C. § 31(a).

et al., 52 L.D. 329 (1928), which referred to an order issued in 1918 by the Commissioner of the General Land Office. That order provided, in part:

"It has been noted that the main product of oil shale is oil. The department is of the opinion that the word 'oil' as used in the act of July 17, 1914, may properly be construed to include oil shale, and under such construction the reservation in Crampton's patent is sufficient to reserve to the United States the oil shale deposits in the patented land."

Union Oil Co. of California, 61 I.D. 106 (1953) followed the Bell case, stating that it had been "consistently followed for some 30 years, therefore it should not be changed in the course of adjudication except for compelling reasons," citing Luckenbach Steamship Co. v. United States, 280 U.S. 173, 182, 50 S.Ct. 148, 74 L.Ed. 356.

■ Although the position of the Department of the Interior has varied over the years as to the form of the reservation in patents embracing oil shale lands, it is abundantly clear that for fifty years it has consistently construed the 1914 Act to authorize the classification of lands containing oil shale deposits as a valuable source of petroleum and nitrogen and to require the reservation of such deposits when patents are issued. The Department's construction of the statute has been made a matter of public record on numerous occasions. It is significant that in the Baxter patent reservation, and in many others, the term "oil" was used, although there was no evidence of the presence of oil except that recoverable from the oil shale. We conclude that the Department of the Interior's interpretation of the meaning of the term "oil" as used in the 1914 statute and in the patent reservations is reasonable, and the courts must therefore respect it. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, reh. denied 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283; Unemployment Compensation Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136. Cf. State of Wyoming v. United States, 10 Cir., 310 F.2d 566, 580, cert. denied 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 977. Furthermore, at all times since the 1914 Act, Congress has not seen fit to interfere with the Departmental construction of the 1914 statute. Practices of the Department of the Interior with respect to oil shale under the 1914 Act were brought to the attention of Congress when the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq., was considered, and in 1956 when the 1914 Act was amended to simplify the procedure established by the Bell decision, supra. S.R. 2524, 84th Cong.2d Sess. (1956); U.S. Code Cong. & Admn. News p. 3391.[4] It is obvious that

---

4. Senate Report 2524, 84th Cong. 2d Sess., regarding H.R. 6501, reads, in part:
"Under the Department of the Interior decision in the case of James W. Bell (52 I.D. 197 (August 1927)) the owner of a valid mining claim located before February 25, 1920, on lands covered by the 1914 act, in order to obtain a patent to the minerals, is required to acquire the outstanding interest of the surface owner and thereafter to execute a deed of reconveyance to the United States; subsequently, a mineral patent to the land, including both the surface and the minerals, is issued to the mining claimant. From 1946 to 1955, inclusive, 71 mining claims, including 67 oil shale claims, were issued under this procedure. The committee is informed that in a few cases mining claimants have been unable to obtain the cooperation of the owners of the surface estate and have been prevented thereby from obtaining patent to the mineral estate."

At a hearing before the Subcommittee examining this proposed legislation, Representative Aspinall of Colorado, who introduced the bill, stated:

"As it now stands, if a mining claim exists on a leasable mineral under land upon which a non-mineral surface right has been granted under the Act of July 17, 1914, the only way this valid right can be taken to patent is for the mining claimant to obtain and reconvey to the government the surface title. After this, the mining claim can be granted and patented and the surface right can be reestablished. Thus, if the surface owner refuses to cooperate in this process, the

throughout the years Congress knew that the Department of the Interior had construed the term "oil", as used in the 1914 Act and in many of the patent reservations, to include oil shale deposits, and it apparently accepted the administrative determination. At least it did not consider the interpretation as being contrary to the statute. Cf. Boesche v. Udall, 373 U.S. 472, 482, 83 S.Ct. 1373, 10 L.Ed.2d 491. The patent in the Bell case had reserved only the "oil and gas" in the lands. If the reservation did not include oil shale, the mineral locator claiming the oil shale had no valid mineral claim, and the 1956 amendment was meaningless so far as Bell was concerned. Nor can there be any doubt but that Baxter knew in 1917 when he executed the consent to the issuance of the patent under the 1914 Act that because of the existence of the oil shale deposits the lands had been classified as a valuable source of petroleum and nitrogen, and he made no objection to the reservation.

■ Finally, Brennan contends that Baxter, having entered upon the land prior to the enactment of the 1914 statute, was entitled to a patent free from any reservations. It is argued that when a homesteader enters upon land and complies with the conditions imposed by statute, he is entitled to a patent vesting title in him as of the time of a valid entry upon the land, citing Knapp v. Alexander-Edgar Lumber Co., 237 U.S. 162, 35 S.Ct. 515, 59 L.Ed. 894, and Ard v. Brandon, 156 U.S. 537, 15 S.Ct. 406, 39 L.Ed. 524. These cases involve conflicts between the entrymen and third parties and were not concerned with statutes directing withdrawal, classification or the reservation of mineral rights prior to final proof of the homesteader upon which a final certificate and patent would issue. Prior to submitting his final proof, which was subsequent to the 1916 classification of the land as a valuable source of petroleum and nitrogen, Baxter freely consented that his entry be considered as made under the 1914 Act and that the patent, when issued to him, should contain the reservations provided for in that Act. At that time he had the right to show that the lands were non-mineral in character and receive accordingly an unrestricted patent.[5] Instead, he chose

---

mining claimant is left with a valid right—but a right foreshortened by his inability to obtain patent. * * *

In my own area, this [Act] would affect mining claims for oil shale, a mineral or oil bearing rock reserved under the leasing laws. * * *

The law of 1914 which provides for the reservation of minerals and patents to be issued at that date did not make it possible to gain a patent on mineral claims which were validly entered into between 1914 and 1920. In my district there are a few cases—and we do not know how many but there are a few of them—where there is a valid existing mineral claim to oil shale where there was also a patent on the surface rights of the same land. In one particular case the owner of the surface rights through a patent issued by the government has refused to reconvey any surface rights to the government so that the government then could issue a new patent including the minerals in the area, and thereby permit the new patentee to give a deed to the owner of the surface lands." * * *

5. The Departmental Regulation, dated March 20, 1915, relating to the 1914 Act in effect at the time, provided, in part:

"(b) Under this proviso, persons who have located, entered, selected, or purchased lands subsequently withdrawn or classified as valuable for such mineral deposits, are allowed the privilege of showing, at any time before final entry, purchase, or approval of selection or location, that the lands are in fact nonmineral in character. * * *

"A withdrawal or classification will be deemed prima facie evidence of the character of the land covered thereby for the purpose of this act. Where any nonmineral application to select, locate, enter, or purchase has preceded the withdrawal or classification and is incomplete and unperfected at such date, the claimant not then having obtained a vested right in the land, must take patent with a reservation or sustain the burden of showing at a hearing, if one be ordered, that the land is in fact nonmineral in character and therefore erroneously classified or not of the character intended to be included in the withdrawal. * * *"

to accept the patent with the reservations, and an attack upon it by his successors in interest almost fifty years after its issuance comes too late. Wetzel v. Minnesota Ry. Co., 169 U.S. 237, 18 S.Ct. 307, 42 L.Ed. 730; Snauffer v. Stimson, 81 U.S.App.D.C. 110, 155 F.2d 861; Adair v. Shallenberger, 7 Cir., 119 F.2d 1017; United States v. Nudelman, 7 Cir., 104 F.2d 549, cert. denied 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493; American Bond and Mortgage Co. v. United States, 7 Cir., 52 F.2d 318, cert. denied 285 U.S. 538, 52 S.Ct. 311, 76 L.Ed. 931.

Affirmed.