Armando Ruiz ARES, Master for himself and on behalf of the officers and crew of the S/S COLON et al., Plaintiffs,

v.

S/S COLON, her engines, tackles, etc., Defendant.

William THOMSON and Alfred Vasquez, Plaintiffs,

v.

S/S COLON, her engines, tackles, etc., Defendant.

PANAWACO INC., a corporation, Plaintiff,

v.

M/S COLON, her engines, tackles, etc., Defendant.

GENERAL STANDARD AND MARINE CORPORATION, Plaintiff,

v.

M/S COLON, her engines, tackles, etc., Defendant.

SHELL INTERNATIONAL PETRO-LEUM CORPORATION, Ltd., Plaintiff,

v.

M/S COLON, her engines, tackles, etc., Defendant.

TODD SHIPYARDS CORPORATION, Plaintiff,

v.

S/S COLON, her engines, tackles, etc., Defendant.

HANSEN & TIDEMANN, INC., a corporation, Plaintiff,

v.

M/S COLON, her engines, tackles, etc., Defendant.

Nos. 2830, 2832, 2836–2838, 2840, 2845.

District Court, Canal Zone, Cristobal Division.

July 3, 1967.

E. J. Berger, Cristobal, Canal Zone, for Armando Ruiz Ares.

De Castro & Robles, Balboa, Canal Zone, for William Thomson and Alfred Vasquez.

Roy Phillipps, Balboa, Canal Zone, for Panawaco Inc. & Hansen & Tidemann, Inc.

Guillermo Jurado, Panama, Republic of Panama, for General Standard and Marine Corp.

Henry L. Newell, L. S. Carrington, Balboa, Canal Zone, for Shell International Petroleum Corporation.

Samuel Theodore Frankel, Cristobal, Canal Zone, for Todd Shipyards Corporation.

## OPINION

CROWE, District Judge.

The above styled cases were consolidated for the purpose of determining the priority of liens and the resolution of other pending subjects and upon being heard for the purpose of the distribution of the proceeds of the sale, it is held by this court that it would seem to be the proper practice, in such a case, for the court to determine not only the amount of each claim, but the validity of each lien as well as the priorities among the liens, if any. See Benedict on Admiralty, Volume 3, Section 451, page 264.

The plaintiff, Panawaco, Inc., plaintiff in Civil Number 2836, claims a lien by reason of being an American supplier and that it is entitled to the priority accorded an American supplier as it contends that the necessaries, service and supplies furnished at a Canal Zone port to the M/S COLON are for the purpose of the Act equivalent to necessaries and supplies "performed or supplied in the United States."

Counsel for the mortgagees of the vessel challenge Panawaco's position and contend that the Act speaks of "necessaries performed or supplied in the United States" and they aver that the Canal Zone is not the United States.

In a controversy between the United States and a foreign nation as to boundary, the courts will follow the decision of those Departments of the Government to which the assertion of its interests against foreign powers is confided, i. e., the legislative and the executive. See Moore International Law Digest, Volume 1, Section 154, page 743.

The treaty between the United States and Panama, executed on November 18, 1903, 33 Stat. 2234, provides in Article III that: "The Republic of Panama grants to the United States all the rights, power and authority within the zone mentioned and described in Article II" (The Canal Zone in which the port of Cristobal lies) "of this agreement and within the limits of all auxiliary lands and waters mentioned and described in said Article II which the United States would possess and exercise if it were the sovereign of the territory within which said lands and waters are located to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority." 3 Canal Zone Code, Appendix III, page 430.

The problem that presents itself to this court is that of following the action of the political Department of the Government in construing the treaty between the United States and Panama and the provision in the above paragraph. The acts of the executive and legislative departments have led to a great deal of confusion and misunderstanding as to the political status of the Canal Zone.

By the Treaty of Mutual Understanding and Cooperation, executed in 1955, Panama is given the right to levy income taxes on certain categories of personnel employed by the Canal Zone Agencies.

By joint communique of January 10, 1963, it was agreed that the flag of the Republic of Panama will be flown "together with the flag of the United States of America on land in the Canal Zone where the flag of the United States of America is flown by civilian authorities." It was further agreed in the same communique that Foreign Consuls, "on the basis of exequaturs issued by the Government of Panama and, in accordance with procedures and understandings which have been agreed upon by the Government of Panama and the Government of the United States, may function in the Canal Zone. Subject to these procedures and understandings the United States Government will cease issuing

documents of exequatur." See Whiteman, Digest of International Law, Volume 3, pages 1132, 1134.

In passing upon the question of whether the transportation of mails between the United States and ports in the Canal Zone was to be considered to be between the United States and a foreign port, and compensation allowed accordingly, as provided in the Revised Statutes, Section 4009, the Supreme Court of the United States said:

"Whether the grant in the treaty amounts to a complete cession of territory and dominion to the United States or is so limited that it leaves at least titular sovereignty in the Republic of Panama, is a question which has been the subject of diverging opinions and is much discussed in the briefs. But for the purposes of this case the construction of the treaty in that regard need not be examined as an original question;—and this because a long continued course of legislative and administrative action has operated to require that the ports in the Canal Zone be regarded as foreign ports within the meaning of section 4009.

"By the Act of March 2, 1905, c. 1311, 33 Stat. 843, which came within less than two years after the treaty, Congress declared that the laws regulating the importation of merchandise and the entry of persons into the United States from foreign countries should apply to and control the importation of merchandise and the entry of persons from the Canal Zone into any State or Territory of the United States or the District of Columbia; and on September 8, 1909 (27 Op.Attys. Gen. 594), the Attorney General, in an opinion given to the Secretary of War, held that the Canal Zone was not a possession of the United States within the meaning of the Tariff Act of August 5, 1909, c. 6, 36 Stat. 11, imposing specified rates of duty upon various articles when imported from a foreign country into the United States or 'into any of its possessions.'

"In 1911, the Postmaster General, being authorized by an Act of March 3, 1891, c. 519, 26 Stat. 830, to arrange for the transportation of mails in American steamships between ports in the United States and foreign ports, submitted to the Attorney General the question whether, as respects mails largely intended for the cities of Colon and Panama, it would be within the letter and spirit of that Act to arrange for the carrying of such mails from the ports of New York and San Francisco to the government docks at Cristobal and Balboa in the Canal Zone. The Attorney General responded in the affirmative * * * (29 Op.Attys. Gen. 194, 196).

\*    \*    \*    \*    \*    \*

"By section 12 of an Act of August 24, 1912, c. 390, 37 Stat. 569 (48 U.S. C.A. § 1330), Congress, while extending to the Canal Zone the laws of the United States relating to extradition and the rendition of fugitives from justice, declared that for such purposes, 'and such purposes only,' the Zone should be treated as an organized Territory of the United States, and by section 9 of an Act of August 21, 1916, c. 371, 39 Stat. 529 (48 U.S.C.A. § 1331), Congress provided that the laws of the United States relating to seamen of vessels of the United States when 'on foreign voyages' should apply to the seamen of all vessels of the United States when in the Canal Zone.

"In 1925, the Department of Labor, construing a provision in the Immigration Act of February 5, 1917, c. 29, 39 Stat. 874, relating to seamen on board vessels arriving in the United States from 'any foreign port or place,' ruled that the ports in the Canal Zone should be deemed foreign ports in the sense of that act, paragraph 4, rule 6, Immigration Laws and Rules of 1925; and in 1926 the Comptroller General held that, as ports in the Canal Zone are considered foreign ports in the absence of special provision to the contrary, an alien seaman shipping on an American vessel from

a port in the Canal Zone is limited in the matter of relief to such as may be extended to an alien seaman shipping on an American vessel from a foreign port. 5 Dec.Comp.Gen. 647.

"True, there have been instances in which Congress specially provided that for particular purposes the Canal Zone should be treated as a Territory or possession of the United States. This is illustrated in the provision already cited relating to extradition and the rendition of fugitives from justice, and in the acts relating to the liability of carriers by railroad for injuries suffered by their employees, Act 22, 1908, c. 149, 35 Stat. 65 (45 U.S.C.A. §§ 51–59); to espionage, Act June 15, 1917, c. 30, title 13, 40 Stat. 231, and to sabotage, Act April 20, 1918, c. 59, 40 Stat. 533 (50 U.S.C.A. §§ 101–103). But the purposes for which these special provisions were made were such that nothing was subtracted thereby from the force of the provisions before mentioned wherein for purposes connected with importation, immigration and ocean transportation between the United States and the Canal Zone Congress required that ports in the latter be regarded as foreign ports." Luckenbach Steamship Company v. United States, 280 U.S. 173, 50 S.Ct. 148, 74 L.Ed. 356 (1930).

At present, Panama and the United States are engaged in the negotiation of a new treaty which has been announced by the political heads of both Governments that when executed and ratified will positively establish sovereignty in the Republic of Panama.

As stated in an opinion as to the status of Canal Zone ports, the Chief Counsel of the Coast Guard recently said, "The only clear conclusion that can be reached is to the effect that owing to the peculiar uncertainty of the Canal Zone status", the statute in question should be applied to it in accordance with the purpose of the Act. This is a reasonable approach and should be followed.

Title 46 U.S.C.A., § 951, in creating the lien of preferred mortgages, terminates the last paragraph by saying, "*Provided, however,* That such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States."

The legislative history of that provision carried in House Report No. 1662, U.S.Code Congressional and Administrative News Volume 2, 83rd Congress, Second Session 1954, at page 2451 states: "But the Ship Mortgage Act at present offers no remedy to American holders of mortgages on foreign-flag vessels. This bill is designed to correct the situation by extending the term 'preferred mortgage' as used in the Ship Mortgage Act to mortgages on foreign vessels when duly executed and registered in accordance with the laws of the foreign nation under which the vessel is documented. *However, in order to provide assistance for American suppliers of goods or services to the foreign vessel, the Department of Commerce recommended that the bill be amended to provide that the preferred mortgage on a foreign vessel be subordinate to the lien of American suppliers.* This amendment was adopted by the committee and appears in the bill as reported." (Emphasis supplied.)

■■ It is the opinion of this court, therefore, that the intent of Congress was to protect suppliers in the United States, or "American suppliers". Plaintiff, Panawaco, is, as pleaded, a corporation organized and existing under and by virtue of the laws of the Republic of Panama. It pays no taxes nor duties to the United States and is in fact a foreign corporation geographically and politically. It therefore can not qualify as a supplier in or of the United States of America and does not appear to be in the category that Congress wished to protect.

It may be that for some purposes the ports of the Canal Zone can be considered as ports of the United States as for the time being at least they are under the jurisdiction of the United States, but for

the purpose of the Ship Mortgage Act a Panamanian corporation furnishing supplies to foreign ships in the Canal Zone ports can not be considered as an American supplier and afforded the priority guaranteed by Section 951 of the Act.