**ANDERSON et al.**

v.

**McKAY, Secretary of Interior.**

No. 11798.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 17, 1953.

Decided March 25, 1954.

Petition for Rehearing Denied
May 11, 1954.

Mr. John F. Cotter, Attorney, Department of Justice, Washington, D. C., with whom Mr. Edmund B. Clark, Attorney, Department of Justice, Washington, D. C., was on the brief, for appellee.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This was a civil action in the United States District Court for the District of Columbia, in which the plaintiffs, Anderson, et al., sought an order directing the Secretary of the Interior to issue to them a patent for certain lands without reservation of mineral rights therein. The District Court granted summary judgment for the defendant Secretary.

The material facts are not in dispute, being largely stipulated. By Acts passed in the 1860's [1] Congress authorized an odd-section grant to a railroad of land within twenty-mile limits of its tracks. The land involved in the present action was a quarter-section within that grant. The railroad never sought or received a patent to this parcel. Nevertheless, in 1879, the railroad sold it to one Warren, from whom the title passed in chain of title to Charles J. Anderson in 1897 and from him to our present appellants, his heirs at law.

It happened that the situation just described occurred in many parts of the West, the railroads selling to unwary purchasers parcels of land within the boundaries of their grants but never patented. The practice became so widespread that in 1887 Congress passed an Act, called the Land Grant Adjustment Act,[2] Section 5 of which provided:

"That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections pre-

Mr. Warren Woods, Washington, D. C., with whom Messrs. Charles B. McInnis and Roger H. Muzzall and Mrs. Irene Kennedy, Washington, D. C., were on the brief, for appellants.

---

1.  12 Stat. 489, July 1, 1862; 13 Stat. 356, July 2, 1864.

2.  24 Stat. 556, 43 U.S.C.A. § 894 et seq.

scribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the bona fide purchaser thereof from said company to make payment to the United States for said lands at the ordinary Government price for like lands, and thereupon patents shall issue therefor to the said bona fide purchaser, his heirs or assigns: * * * ."

Since 1897 Anderson and his heirs have been in open and exclusive possession of the land. They have occupied, fenced, farmed, and paid taxes on it continuously to the present time. The grant to the railroad was closed out in 1930, and this parcel was not listed under the grant. Thereafter it was shown on the tract books of the General Land Office as vacant.

On March 2, 1936, one Buckholts filed an application for a non-competitive oil and gas lease on this land under the provisions of the Mineral Leasing Acts of 1920 and 1935.[3] The 1920 Act authorized leases, and the 1935 Act gave a preference right to the first applicant for a lease of land not within any known geologic structure of a producing oil or gas field. On July 20, 1936, Anderson filed an application to purchase the tract under the above-quoted provision of the Act of 1887. On August 21, 1936, the Commissioner of the General Land Office held Anderson to be entitled to a patent without reservation of mineral rights, upon the payment of the required purchase price and the publishing of notice for the required time, and he denied the application of Buckholts. These rulings were in a document from which we shall quote later. Anderson proceeded to make the required payment and to publish the required notices. On September 18, 1936, Buckholts appealed to the Secretary of the Interior from the decision of the Commissioner. On October 26, 1936, Anderson completed his notices and perfected his right to the issuance of a patent pursuant to the terms of the ruling in his favor. On December 31, 1936, the Secretary reversed the decision of the Commissioner. He held that Anderson was entitled to a patent only with reservation of mineral rights to the United States and that Buckholts was entitled to a non-competitive oil and gas lease. The ground of the Secretary's ruling was that the Act of 1887 had been altered by an Act of 1914[4] and by the Acts of 1920 and 1935.

Reports concerning the mineral or non-mineral character of the land varied. In 1936 there was no indication that the land was mineral in character. On June 22, 1937, the Geological Survey reported that the land "is in an area which may contain accumulations of oil or gas under favorable structural conditions and offers an opportunity for prospecting operations to determine the nature and worth of the structural features affecting it. Accordingly, it is reported as having a prospective value for oil and gas within the intent of paragraph 12 (c) of the Oil and Gas Regulations." On August 11, 1939, the Secretary advised Anderson that a lease would be issued to Buckholts unless Anderson made an affirmative showing that the land was nonmineral. Anderson attempted to make such a showing, but the Geological Survey held that he had not met the burden. For undisclosed reasons, in 1946 the Geological Survey reported to the General Land Office that no part of the land in question "is within the known geologic structure of a producing oil or gas field." The General Land Office requested another report, and the Geological Survey, on February 26, 1947, iterated that the land was not within the known geologic structure of a producing oil or gas field. On May 1, 1947, the

3. 41 Stat. 437, as amended, 30 U.S.C.A. §§ 181, 193, 201; 49 Stat. 676, 30 U.S.C.A. § 226.

4. 38 Stat. 509, 30 U.S.C.A. §§ 121–123.

Secretary issued an oil and gas lease to Buckholts, which was assigned by him to the Central Commercial Company.

We examine the rights of the Andersons as of three critical points of time. One such time was when Warren, their predecessor in title, bought the land from the railroad, *i.e.*, in 1879. Another was in the year 1914, after Anderson's purchase in 1897. And the third was when Anderson completed compliance with the terms laid down by the Land Office for a patent, *i.e.*, on October 26, 1936.

The rights of the railroad in the land were prescribed by the Act of 1862, amended in some respects by the Act of 1864. Those Acts dealt with two distinct and different steps—the grant and the patents. The Acts themselves made the grant. The language of Section 3 of the 1862 Act was "That there be, and is hereby, granted to the said company * * * every alternate section of public land, designated by odd numbers, to the amount of five [changed by the 1864 Act to ten] alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten [changed by the 1864 Act to twenty] miles on each side of said road". Thus the grant was to the odd-numbered sections of land within twenty miles on each side of the railroad tracks. But the tracks were not then built; they were not even located on paper. The Act dealt with the whole line of the Union Pacific Railroad Company, which began in Nebraska and ended at the western boundary of the Nevada Territory and included Iowa and Missouri branches, and the line of the Central Pacific Railroad from the Pacific Coast to the eastern boundary of California. The Act provided (Section 7) that within two years after the passage of the Act (extended one further year by the 1864 Act) the companies should designate "the general route of said road, as near as may be". So, while the grant was to a vast strip of land, part of an area two thousand or more

miles long and forty miles wide, it was not then known, and could not then be known, to what land it actually applied.

The grant did not include mineral lands. The statutes expressly provided that mineral lands were excepted from the grant. The 1862 Act provided "That all mineral lands shall be excepted from the operation of this act". The 1864 Act, without deleting the exclusion of mineral lands in the 1862 Act, added this proviso: "And any lands granted by this Act, or the act to which this is an amendment, shall not * * * include any * * * mineral lands, * * *." Thus the railroads had no grant of mineral lands.

The 1862 and 1864 statutes provided that as each forty miles of railroad were completed three commissioners appointed by the President should inspect them and, upon their certificate, patents to the granted sections on each side of the completed strip of track would issue to the railroad. Those patents conveyed the fee simple title to the land. The language of the 1862 statute was: "* * * patents shall issue conveying the right and title to said lands to said company * * *."[5]

The foregoing features of the statutes gave rise to litigation and consequent decisions of the Supreme Court. Barden v. Northern Pacific R. R. Co.[6] concerned mineral land which was within the geographical limits of a grant to a railroad, identical in all material respects with the grant in the case before us. The land had been entered by Barden as mineral land, quartz lodes having been located on it long after the grant. No patent had issued. The Court held that the specific exception of mineral lands in the statute, being unconditional, applied to mineral lands as such whether known to be so or not. The Court made vivid its view by depicting the different situation which would have existed had a patent been issued. The process of passing upon an application for a patent, said the

5. Sec. 4, 12 Stat. 492.

6. 154 U.S. 288, 14 S.Ct. 1030, 38 L.Ed. 992 (1894).

Court, involved a determination by authorized Government officials that the land was non-mineral and patentable.[7] After a patent, conveying fee simple title upon that determination, the Government would be estopped from contending to the contrary, absent fraud, the Court said.[8] The Court concluded: "The plaintiff in this case, not having a patent, and relying solely upon its grant, which gives no title to the minerals within any of its lands, shows by its complaint no cause of action for the possession of the mineral lands claimed."[9]

■ In the case at bar the railroad could convey only that which it had. Therefore, when it purported to convey to Warren in 1879, it could not, and so did not, convey mineral lands. Should the land eventually prove to be mineral land, it was not within the grant to the railroad[10] and hence was not conveyed by it to Warren.

As we have pointed out, this practice of the railroads—selling land which they did not have—became so prevalent that in 1887 Congress passed the Act, from which we have quoted, to remedy the plight of the purchasers. It authorized the issuance of patents to such purchasers. The patent, if obtained, would convey to the patentee the title which he had not received by his deed from the railroad, and, moreover, the patent would erase flaws or omissions which inhered in the grant to and the conveyances from the railroad. So after 1887 Warren's successors in the line of conveyance had a right to secure a patent to the land. They did not secure one.

■ The Andersons' case rests in large part upon their view of the 1887 Act. They maintain that it gave Anderson's predecessor in title and him an indefeasible right to an unrestricted fee simple title. But the statute did not go that far. It gave Anderson a right to apply for and obtain a patent. But it was an inchoate right.[11] Congress could have repealed the statute, and if it had done so all unexercised rights to patents under it would have disappeared. In respect to that statute the Supreme Court held in Ramsey v. Tacoma Land Co.:[12] "Obviously the statute is not a curative one, confirms no title, but simply grants a privilege."

This brings us to Anderson's situation in the year 1914. He had acquired by virtue of his purchase in 1897 only that which the railroad had had under its grant, and so he had acquired by that deed no land which was mineral land; and, if all the land purportedly thus conveyed was mineral land, he had acquired nothing in fee simple. He had acquired, however, by virtue of his deed and by virtue of the 1887 Act of Congress, a right to secure from the Government a patent. But by 1914 he had not applied for a patent or complied with the terms of the grant of the right to obtain one. He had not exercised the right Congress had given him.

■■ In the early acts relating to public lands Congress had treated mineral and non-mineral lands by different methods. Patents could be obtained for non-mineral lands under provisions of law which, as amended, now appear in Title 43 of the United States Code Annotated, particularly at Section 161 et seq. Mineral lands were specifically excepted from those provisions.[13] Patents for lands in which valuable mineral deposits were found could be obtained under provisions of law which, as amended,

---

7. See also West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265 (1929); Davis v. Wiebbold, 139 U.S. 507, 11 S.Ct. 628, 35 L.Ed. 238 (1891); 36 Am.Jur., Mines and Minerals §§ 13–14, and cases there cited.

8. And see Deffeback v. Hawke, 115 U.S. 392, 6 S.Ct. 95, 29 L.Ed. 423 (1885).

9. Supra, 154 U.S. at 332, 14 S.Ct. at 1040, 38 L.Ed. at 1003.

10. Barden v. Northern Pacific R. R. Co., supra.

11. See Clogston v. Palmer, infra.

12. 196 U.S. 360, 363, 25 S.Ct. 286, 287, 49 L.Ed. 513, 514 (1905).

13. Rev.Stat. § 2302, 43 U.S.C.A. § 201.

now appear in Title 30 of the Code, particularly in Sections 22 and 29.[14] Whether land with both characteristics should be treated as mineral or as non-mineral depended upon which of its values was the greater.[15] In 1914 Congress introduced a new concept into the treatment of lands reported to be valuable for certain specified minerals—phosphate, nitrate, potash, oil, gas, or asphaltic minerals.[16] It provided that such land could be entered or purchased and then patented under the non-mineral land laws, but with a reservation to the Government of those minerals. It provided that, if a person had theretofore in good faith purchased or entered land under the non-mineral land laws and the land was subsequently found to be valuable for the specified minerals, such a person could get a patent for his land but with a reservation to the Government of those minerals. It is clear enough that this 1914 Act contemplated land as to which no patent had theretofore been issued. It made no attempt at forfeiture of issued patents and made no reference to another, or a second, or an amended, patent. So, if Anderson had exercised prior to 1914 the right which he and his predecessors had had since 1887, he would not have been affected by the 1914 Act.

It is also clear that, even though basically the 1914 Act was intended to be an extension of patent rights, it also actually restricted patent rights theretofore existing in respect to many lands patentable either as mineral or as non-mineral lands. In terms it was all-inclusive as to lands reported as valuable for the specified minerals. It applied in terms to "Any person who has, in good faith, located, selected, entered, or purchased". It said that such a person "may, upon application therefor," receive a patent, but with a reservation to the United States of the named minerals. In the face of these unqualified provisions we do not see how we could by construction write an exception into the statute. We cannot except from its terms applicants for patents under the 1887 Act when Congress has not done so.

We think this situation not unlike that considered by this court in West Coast Exploration Co. v. McKay, —— U.S.App. D.C. ——, —— F.2d —— (Jan. 26, 1954). There Congress in 1855 had given the Gerard heirs a right to enter public lands to be selected by them. But no selections were made by them until 1947, when the holder of the land "scrip" selected land containing minerals, i. e., deposits of sodium and calcium borates. By that time the Mineral Leasing Acts had been passed and other withdrawals made of lands containing those minerals. We were compelled to hold that the selection was too late.

So in this case, so far as the 1914 Act is concerned, we think it sharply restricted all patent rights which had theretofore existed, but had not been exercised, in respect to lands reported to be valuable for certain mineral deposits.

In 1920 Congress moved forward in its treatment of certain minerals in the public lands. Instead of the acquisition of rights by location and subsequent patent, it provided that deposits of coal, phosphate, sodium, potassium, oil, oil shale, and gas could be leased.[17] It provided that the named deposits could be disposed of by the Government only in the manner provided by that Act. It contained an exception—"except as to valid claims existent on February 25, 1920".[18] The Andersons would make this exception an indication of the continued validity of their right in its original form. But, even if the 1887 right could be deemed to be a "claim" under the mineral law, which we doubt, the application of the exception in the 1920

14. As to oil see Act of Feb. 11, 1897, 29 Stat. 526.

15. Davis v. Weibbold, 139 U.S. 507, 11 S. Ct. 628, 35 L.Ed. 238 (1891).

16. Supra note 4.

17. 41 Stat. 437, as amended, 30 U.S.C.A. §§ 181, 193, 201.

18. 41 Stat. 451, as amended, 30 U.S.C.A. § 193.

Act would afford the Andersons no benefit. It would except them from operation of the leasing act but would not remove them from the reservation requirement of the 1914 Act in respect to a patent.

The Andersons say that until the decision in the present case the Interior Department had consistently followed a rule, established in two cases in 1902 [19] and 1903,[20] that the transferees of a bona fide purchaser under the 1887 Act are entitled to a fee simple patent if the land was not known to be mineral in character at the time of the original purchase from the railroad. They say that, while the Department has never expressly stated that the 1914 Act does not modify rights under the 1887 Act, it has never expressly stated the contrary. They contend that the conclusions reached by the Department in three cases, The Alabama Company,[21] Sarah Barton,[22] and John Stanley,[23] are clearly premised upon the assumption that rights under the 1887 Act were not modified by the 1914 Act.

A problem concerning mineral land was inherent in the 1887 Act. For some reason not now apparent, it did not arise quickly. The statute prescribed that to get a patent the purchaser from the railroad must be a "bona fide" purchaser. A person who bought from a railroad land then known to be mineral would be presumed to have known that the railroad had no grant of that land; he would not be a bona fide purchaser. In 1903 the Interior Department faced this problem and decided it. In Clogston v. Palmer [24] land was purchased from a railroad. Thereafter, but before the purchaser applied for his patent, it became known that the land contained minerals. The issuance of the patent was protested, but the Department ruled that, since the mineral character of the land was not known at the time of the purchase from the railroad, the purchaser was a bona fide purchaser, that therefore the 1887 Act applied to him and he was entitled under that Act to a patent. The Department adhered to that view in a number of other cases.

The Andersons say that since 1914 the Department has consistently relied upon and followed its decision in Clogston v. Palmer and has in at least three cases issued unrestricted patents to applicants under the 1887 Act. They maintain that this amounts to a long-continued administrative construction that the 1914 Act did not affect the 1887 Act or the rights granted thereunder. We have examined carefully the cases they cite.

In 1924 the Department had before it an application of The Alabama Company, supra, filed under the 1887 Act. This Company had a title derived through mesne conveyance from a railroad to which a grant had been made. The lands were the numbered sections prescribed by the grant, but they were excepted from the operation of the grant because the railroad was never built. The granting act, an act of June 3, 1856,[25] contained no reservation of mineral lands, and in that respect it differed from the Acts of 1862 and 1864 which are before us in the present case. Somewhere along the line in the Alabama case there had been separate conveyances of mineral interests, and so the question was presented whether a patent under the 1887 Act could or could not include minerals. The Department ruled consistently with the Clogston decision, citing it. But nothing in the record indicates that the land contained any of the minerals listed in the 1914 Act, and in fact several refer-

19. Hutton v. Forbes, 31 L.D. 325.

20. Clogston v. Palmer, 32 L.D. 77.

21. Montgomery, Ala., Serial No. 011501, decided April 17, 1924.

22. G.L.O. 03052, Patent No. 1045134 issued March 26, 1931.

23. Phoenix, Ariz., Serial No. 072500, decided Jan. 19, 1933.

24. Supra note 20.

25. 11 Stat. 17.

ences indicate that coal and iron were the minerals involved. The patent was issued to The Alabama Company.

In 1931 the Department had before it an application of one Sarah Barton, supra, to purchase under the 1887 Act. She filed an affidavit reciting that the land was "essentially nonmineral" and that it did not contain any known oil or any valuable mineral other than iron or coal. The patent was issued, and no reference was made to the subject of minerals.

In 1933 the Department had before it an application of one John Stanley, supra, for a patent under the 1887 Act. One Ross, an entryman under the Stock Raising Homestead Act, protested the grant of Stanley's application on two grounds, one of which was that the land was mineral in character and that mineral land could not be acquired under the 1887 Act. The Department ruled in reliance upon the Clogston decision, citing it. But the record in the case shows that the mineral deposits were gold, silver and copper.

The 1914 Act treated, as we have shown, land which contained certain specified minerals. There is nothing in any of the cases cited to show that the lands there involved were thought to be valuable for phosphate, nitrate, potash, oil, gas or asphalt, the minerals specified in the Act.

It is difficult to determine from the authorities the precise rule as to the effect to be given long-continued administrative construction of a statute. Expressions of the Supreme Court vary all the way from "pertinent",[26] "ha[s] weight",[27] and "entitled to persuasive weight"[28] to "ought not to be overruled without cogent reasons."[29] But, however that may be, it is certain that to be given any effect an administrative construction must have been a ruling which can reasonably be held to have decided the point presently in issue.[30] The rulings cited to us by appellants did not actually deal with the effect of the 1914 Act on the 1887 Act, either in fact or in language. It is impossible, therefore, for us to say that those rulings constituted an administrative determination upon the point or an administrative construction of the statutes.

We come now to Anderson's situation in October, 1936. The sequence of events was as follows: The railroad grant was "adjusted and closed" in 1930. Anderson's land was never listed under the grant. In 1935 Congress amended the Mineral Leasing Act (the Act of 1920) and included a provision that after August, 1935, the first qualified person to make an application for a lease of lands not within any known geologic structure of a producing oil or gas field should be entitled to a preference right over others to a lease without competitive bidding at a statutory royalty. On March 2, 1936, Buckholts made an application for such a lease of the oil and gas deposits on the land covered by Anderson's deed. On July 20, 1936, Anderson made an application for a patent to the land without reservation of mineral rights. On August 21, 1936, the General Land Office, over the signature of its Assistant Commissioner, approved Anderson's application and rejected Buckholts's. The precise holding of this document is critical to the controversy, and so we quote the concluding portion in full. It said:

"Anderson is allowed a period of 90 days from receipt of notice hereof within which to make the said

26. Great Northern Ry. Co. v. United States, 315 U.S. 262, 275, 62 S.Ct. 529, 86 L.Ed. 836 (1942).

27. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 330, 59 S.Ct. 191, 83 L.Ed. 195 (1938).

28. Billings v. Truesdell, 321 U.S. 542, 553, 64 S.Ct. 737, 744, 88 L.Ed. 917 (1944).

29. Heath v. Wallace, 138 U.S. 573, 582, 11 S.Ct. 380, 383, 34 L.Ed. 1063, 1068 (1891). See also Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457 (1930).

30. Estate of Sanford v. Commissioner of Internal Revenue, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939).

payment of $200.00 and to forward the evidence of publication. If he does not comply herewith or appeal herefrom within the time allowed, his application G.L.O. 06488 will be rejected, subject to the right of appeal. If he makes the payment and forwards the evidence as above required, further action will be taken on the application with a view to issuing patent thereon in the absence of objection.

"A right to purchase under Sec. 5 of the act of March 3, 1887, carries with it the right to minerals in the land, provided the original purchaser from the beneficiary of the grant did not know of the mineral character of the land at the time of such purchase. 32 L.D. 77: 31 L.D. 325. There is no evidence of such knowledge of mineral character on the part of Albert E. Warren, the original purchaser. As Anderson under his application would have a right to any oil and gas discovered, Buckholts can gain nothing from his lease application 06362, being for oil and gas which would, if discovered, actually be Anderson's.

"Accordingly, Buckholts' Application 06362 is hereby rejected, subject to the right of appeal. If Buckholts does not file an appeal in this office within thirty days from receipt of notice hereof, the rejection of his application will be made final and the case closed in relation thereto without further notice. Copy of appeal should be served on Anderson, and evidence of such service should be filed here."

From that quotation we note that the right of Anderson to an unrestricted patent and the right of Buckholts to a mineral lease were treated as mutually exclusive (as indeed they were); that Anderson was not told that his application was or would be approved if he complied with the specified terms, but rather that if he did so "further action" would be taken on the application with a view to issuing a patent thereon "in the absence of objection"; and that Buckholts's application was rejected "subject to the right of appeal." The Land Office was not the final administrative agent in the matter. Appeal from its ruling lay to the Secretary. This ruling, as we have said, was on August 21, 1936. Buckholts filed an appeal on September 18, 1936. On October 26, 1936, Anderson completed compliance with the terms of the Land Office ruling.

The Andersons say that after October 26, 1936, Anderson was the equitable owner of the unrestricted fee simple title to the land, the Government holding the bare legal title as trustee for him, and that the delivery of the patent instrument was merely a ministerial act which can be directed by a court. Appellants argue, citing many cases,[31] that, when an applicant for a land patent has done all that the law requires him to do and is under the law entitled to a patent, the Government thereafter holds the title to the land in trust for him; that an applicant in that position becomes the equitable owner of the property; and that he is entitled to *mandamus* to compel delivery to him of his patent papers. The difficulty with Anderson's case is that he never progressed beyond midway of the administrative process and the basic question at issue had not been decided. That is the real nub of this case. By the express terms of the ruling of the General Land Office, which is the basis for Anderson's claim that he is the equitable owner, his rights were subject to later consideration by the Secretary.

31. Lytle v. Arkansas, 9 How. 314, 50 U.S. 314, 13 L.Ed. 153 (1850); Wirth v. Branson, 98 U.S. 118, 25 L.Ed. 86 (1878); Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892); Payne v. Central Pacific Ry. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598 (1921); Payne v. New Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921); Wyoming v. United States, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921).

Appellants rely strongly upon Wyoming v. United States.[32] That case involved a selection of lieu lands in an exchange, and no patent was provided for in the arrangement. The Court held that the Secretary was required to pass upon the selection list as of the time it was submitted. But the Court expressly pointed out that the rule was different as to the determination of the mineral or non-mineral character of lands in railroad grants. That determination is to be made as of the time the patent issues. The Court cited and discussed Barden v. Northern Pacific R. R. Co., supra, and inferentially in the strongest fashion reaffirmed it. That the Secretary's determination of mineral or non-mineral character in such a case is a quasi-judicial determination involving discretion was established in Gaines v. Thompson.[33]

Even if the 1887 Act were held to eliminate the mineral land exclusion from patentability, the requirement for a patent still remained, and the Secretary had to pass upon the application. And in the meantime, in 1914, before any application was filed, Congress imposed a new restriction upon patents to mineral land. That, too, was a matter for the Secretary to pass upon. In the present case it makes no difference whether he was to act as of the date of the application or as of the date of a possible award. In either event the problem of potential value for minerals had already been raised by Buckholts's application under the 1935 Act. The Departmental instructions [34] put the burden on the claimant for a patent. They provided that, if the Geological Survey reported land to be in an area in which oil might occur because of the absence of reliable evidence of geological structure unfavorable to oil, the claimant must make a showing. This was the situation in which Anderson filed his application.

Anderson's argument in essence is that he can compel the Secretary to make a determination that these lands are non-mineral, although in fact there is substantial ground in the reports of the Geological Survey for the Secretary to determine that they are mineral lands and not patentable. But it is established beyond the necessity for citation that the courts cannot control by *mandamus* the nature of decisions entrusted by Congress to executive officials.

Thus upon consideration it appears that the prayer of the complaint is in reality a prayer that property of the United States, as to which Congress has made no mandatory directions, be transferred to the Andersons. It follows that the disposition directed in the West Coast case, supra, should be made. The case must be dismissed for lack of jurisdiction by reason of the absence of an indispensable party, *i.e.*, the owner of the property, the United States. For this purpose the judgment of the District Court will be vacated and the case remanded for entry of an order of dismissal.

The result of the case appears to be harsh, in that oil and gas rights on property which had been for over half a century in the possession of one family under an ostensible fee simple title, go to a newcomer who applied for a mineral lease on property not then known to be valuable for minerals. But during all those years there was no impediment to Anderson's protection of his complete ownership, and Congress evidently meant to encourage prospecting.

Remanded with directions to dismiss for lack of jurisdiction.

32. 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921).

33. 7 Wall. 347, 74 U.S. 347, 19 L.Ed. 62 (1869).

34. Circular 1344, Jan. 19, 1935, 55 I.D. 120.