**UNITED STATES of America,**
**Plaintiff,**

v.

**DELTA DEVELOPMENT COMPANY, Inc., Mildred Heintz Pottharst, John E. Pottharst, Jr., Mildred Pottharst Ellis, Viola Pottharst Rowland, Getty Oil Company, Gulf Oil Corporation, Thomas Connell and Louisiana Land and Exploration Company, Defendants.**

**Civ. A. No. 69–74.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Nov. 16, 1970.

Norton L. Wisdom, Asst. U. S. Atty., New Orleans, La., for plaintiff.

H. M. Holder, Tucker, Martin, Holder, Jeter & Jackson, Shreveport, La., A. Lane Plauche, Lake Charles, La., for Delta Development Co., Inc., Mildred Heintz Pottharst, John E. Pottharst, Jr., Mildred Pottharst Ellis and Viola Pottharst Rowland.

Austin W. Lewis, John King, Liskow & Lewis, New Orleans, La., for Getty Oil Co. and Gulf Oil Co.

John M. McCollam, Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., for Louisiana Land & Exploration Co.

Melvin Evans, New Orleans, La., for Gulf Oil Co.

CASSIBRY, District Judge:

This is an action by the United States to quiet its title to the mineral rights in 1921.62 acres of land in Plaquemines Parish, Louisiana.[1] The property is located in the Bastian Bay gas field and is quite valuable for minerals.

The suit involves a determination of the validity of a mineral reservation in favor of the United States that was incorporated in a 1947 land patent granted by the Government to John E. Pottharst. The principal defendants are the heirs of Pottharst and Delta Development Company, Inc., the transferee of Pottharst as to a portion of the property. Named as additional defendants were Getty Oil Company (the successor by merger of Tidewater Oil Company) and Gulf Oil Corporation, the mineral lessees of the property, holding under a mineral lease granted by the United States pursuant to the provisions of the Mineral Leasing Act of February 25, 1920 (30 U.S.C. § 181, et seq.) Also named were The Louisiana Land & Exploration Company and Thomas Connell, the owners of overriding royalty rights under that federal lease.

The mineral lessees, Getty and Gulf, actively joined the United States by adopting in their answers all of the allegations of the Government's complaint. The two companies then proceeded by cross-claim against the Delta-Pottharst Group and asserted certain special pleas and contentions. These included the assertion of the doctrine of acquiescence, a plea of estoppel, a claim that any attack on the patent granted by the United States is a prohibited collateral attack on that document and, finally, the assertion of their position as bona fide third parties who had purchased on the faith of the public records of Plaquemines Parish.

The matter was originally put at issue by motion and cross-motion for summary judgment, but all of the parties later executed and filed a stipulation which submitted the matter on the merits as to all issues. While the record is voluminous, the facts are entirely undisputed although questions were raised concerning the relevancy and admissibility of certain documents.

## THE STATUTORY SCHEME

The land in question originally comprised a portion of a military reservation, having been set aside for military purposes by an 1844 Executive Order. On September 3, 1886, the reservation was abandoned. This was accomplished by a revocation of the original withdrawal order by a second Presidential order of that date. This second order turned the property over to the Secretary of the Interior for disposition under the Act of July 5, 1884.[2]

It may make for clarity to consider at this point not only the 1884 statute but all other pertinent Congressional acts in force when this land was patented to Pottharst in 1947.

The Act of July 5, 1884 dealt specifically with the conveyance by the Secretary of the Interior of abandoned military reservation lands. It is important to note that the statute did not purport to be a Congressional or *in praesenti* grant, but rather it vested in the Secretary the discretionary authority to dispose of the properties. The Act provided for the surveying and appraisal of the lands and for offering for sale at public auction. If this method of disposal was not successful, the Secretary was then authorized to convey the land by private sale. The property in question had twice been unsuccessfully offered for sale at public auction before Pottharst made his

---

1. The United States initially sought injunctive relief against a state court action in the District Court of Plaquemines Parish which sought the cancellation of the federal mineral lease held by Getty and Gulf. The court has been advised by the parties, however, that by agreement no further action will be taken in the state suit pending the outcome of this litigation.

2. 23 Stat. 104; see also 43 U.S.C. § 1074.

application to purchase it by private sale.

Section 5 of the 1884 Act is significant. It provided as follows:

"Sec. 5. Whenever any lands containing valuable mineral deposits shall be vacated by the reduction or abandonment of any military reservation under the provisions of this act, the same shall be disposed of exclusively under the mineral land laws of the United States."

In 1914 Congress adopted the Mineral Reservation Act of July 17, 1914.[3] This was the first major step taken by Congress after years of study to protect the valuable mineral resources of the United States. This 1914 statute authorized the sale under any applicable nonmineral land law of public domain lands "withdrawn or classified or reported as valuable * * *" for minerals, subject to the specific requirement and condition that the mineral rights therein be reserved to the United States.

As the final step in the consummation of its mineral policy, Congress enacted the Mineral Leasing Act of February 25, 1920.[4] This statute specified that mineral leasing of the lands and mineral rights of the United States was the exclusive method of disposing of such rights.

■ Executive Order No. 6964, issued on February 5, 1935, withdrew from entry or sale all of the public domain lands located in specifically named states, including Louisiana. In the following year Congress amended the Taylor Grazing Act to insure the maximum utilization of the lands withdrawn under the 1935 Executive Order. To accomplish this, the amendment authorized the Secretary of the Interior, in his discretion, to classify any of these lands as being more valuable for agricultural purposes or "more valuable or suitable for any

other use than the use provided for in this Act." It then authorized the Secretary to open the lands for entry and disposal "under applicable Public Land Laws."[5] It seems clear that any property that originally was subject to the Executive Order was fully restored to public lands status by this amendment and thereafter was available for disposal under any public land law.[6]

## FACTS

This was the statutory scheme in existence when John E. Pottharst made application on July 17, 1946 to purchase these lands. He filed a "petition for classification" in which it was requested that the lands be classified as required by law and that he be permitted to acquire title thereto. He also filed a nonmineral affidavit which stated that to his knowledge the land had no mineral value.

On July 23, 1946 the Chief of the Indian Lands and Grazing Division, Bureau of Land Management, requested a report from the United States Geological Survey concerning whether the lands affected by the Pottharst application were valuable for any mineral deposits. The Geological Survey is the agency within the Interior Department charged with the responsibility of making the mineral determination of all public lands prior to their disposal.

One of the important issues in this case is whether these properties actually were found or reported to be valuable for minerals before John E. Pottharst acquired any vested rights in them. This justifies the following detailed account of the actions that were taken following the original request to the Geological Survey:

(1) On July 24, 1946, the Director of the Geological Survey replied to the Commissioner of the Bureau

3. 30 U.S.C. § 121 et seq.

4. 30 U.S.C. § 181, et seq.

5. Taylor Grazing Act, as amended June 26, 1936, 43 U.S.C. § 315, et seq.

6. This is important in view of defendants' contention (discussed *infra*) that these properties were not "public lands" of the United States and that they enjoyed a special status as abandoned military reservation lands.

of Land Management that available information indicated that these lands were prospectively valuable for oil and gas and that said lands were without value for other minerals.

(2) On August 30, 1946, the Acting Director of the Bureau of Land Management directed a memorandum to the Supervisor of the Branch of Field Examination requesting that a report of field examination of the subject lands be made. Copies of the application, status sheets, Geological Survey report and Circular No. 1072 were enclosed with that request.

(3) On October 29, 1946, Field Examiner Benjamin F. L. Heron filed a three-page typewritten report based on an on-the-ground investigation of this property made by him on October 22, 1946, which report stated that the area had a prospective value for oil and gas and that these minerals, together with sulphur, potash or other liquid or gaseous hydrocarbon minerals, or in absence of convincing evidence to the contrary, should be reserved from disposition.

(4) On January 7, 1947 the Chief of the Indian Lands and Grazing Division directed a supplemental request for a report to the Director of Geological Survey requesting information as to whether the lands involved were valuable for any mineral deposits.

(5) On January 8, 1947, the Director of the Geological Survey replied to the Acting Director of the Bureau of Land Management that available information indicated that these lands were prospectively valuable for oil and gas and it was without value for other minerals.

On February 20, 1947, the Director of the Bureau of Land Management recommended that the lands in question be classified for sale under Section 7 of the Taylor Grazing Act and that the property be disposed of in accordance with the terms of the Act of July 5, 1884, or as otherwise provided by law.

On February 25, 1947, Lee Muck, Assistant to the Secretary in Charge of Land Utilization, in connection with the proposed classification, addressed a memorandum to the Secretary of the Interior stating:

"Subject: Mineral reservation in patent, BLM 011101.

"I have surnamed the attached memorandum recommending the sale of certain lands in Louisiana under the act of July 5, 1884, after having been given verbal assurance by the Bureau of Land Management that the patent issued on these lands will contain a reservation of minerals, under applicable law. It appears that reference to such a reservation was omitted from the memorandum inadvertently."

On February 28, 1947 Warner W. Gardner, in the performance of his duties as the Assistant Secretary of the Interior, approved the February 20, 1947 recommendation for the sale of these lands by signing the letter of recommendation. He wrote on the memorandum "See Muck memorandum of 2/25." The deposition of former Secretary Gardner was taken, and he testified that the handwritten notation formed a part of his official act. This action of Secretary Gardner in approving the recommendation constituted the classification of the land for sale.

On March 10, 1947, John E. Pottharst executed a document entitled "Mineral Waiver (Oil, Gas, Etc.) Consent to the placing of application under the Act of July 17, 1914 (38 Stat. 509)." In this instrument, Pottharst consented to the amendment of his application for the purchase "so as to reserve to the United States all the phosphate, nitrate, potash, oil, gas or asphaltic mineral deposits in the land embraced in said application, pursuant to the provisions, conditions, reservations, and limitations of the Act of July 17, 1914 (38 Stat. 509)."

On March 25, 1947, the Director of the Geological Survey wrote to the Director of the Bureau of Land Management noting the prior recommendations that oil and gas be reserved to the United States in the sale of said land, and concurred in the additional recommendation that sulphur and potash be reserved. It was also recommended that sodium be reserved.

On March 25, 1947, the Bureau of Land Management issued a "certificate" in favor of John E. Pottharst concerning the subject lands. The certificate appearing in BLM File No. 011101 as of October 29, 1969, had affixed thereto in the upper lefthand margin a combination rubber stamp and written notation to the effect that:

"Application made in accordance with and subject to the provisions and reservations of the Act of July 17, 1914 (38 Stat. 509) as to oil, gas, sulphur, potash & sodium, as amended by the act of March 4, 1933 (47 Stat. 1570). * * * "

On April 22, 1947 Patent No. 1122086 was issued by the United States to John E. Pottharst describing the subject lands and containing the following clause:

"Excepting and reserving, however, to the United States all the oil, gas, sulphur, potash and sodium, in the lands so patented, and to it, or persons authorized by it, the right to prospect for, mine and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914 (38 Stat. 509) as amended by the Act of March 4, 1933 (47 Stat. 1570)."

Pottharst recorded this patent in the records of Plaquemines Parish on June 7, 1947.

On July 2, 1947, Pottharst conveyed a portion of the land to Delta Development Company, Inc. The deed to Delta contained the following provisions:

"Being the same property acquired by VENDOR from the United States of America by recorded Patent No. 1122086, dated April 22, 1947, registered in Plaquemines Parish, COB 125, Fo. 503 on June 7, 1947.

"This sale is made subject to the RESERVATION of all mineral rights reserved to the United States of America under said Patent issued to VENDOR."

On April 2, 1954 the existing federal lease (BLM Lease No. 036201) was granted to Thomas Connell. It was made effective as of May 1, 1954. Through subsequent assignments, title to this lease vested in Tidewater Oil Company (now Getty) and Gulf. These companies, through Tidewater as operator, commenced the drilling of the first well on the property under this federal lease on June 26, 1958.

On October 18, 1958, John E. Pottharst died in the City of New Orleans. His succession was opened in Orleans Parish. The portion of this property not sold to Delta was described and identified in both the Inventory and in the Judgment of Possession in the succession proceedings; and at the end of the description of the land in both of these succession documents are the following statements:

"All minerals reserved to U. S. A.

"Being the same property acquired by John E. Pottharst by Patent #1122086 from the U.S.A. on April 22, 1947, and duly registered in C.O.B. 125, Folio 503, on June 7, 1947."

Until the filing of their pleadings in the present suit, neither John E. Pottharst nor his heirs had taken any action to disavow the several acts listed above in which they recognized the ownership of the mineral rights in this land to be vested in the United States. Delta did not take any formal action in connection with this protest until April 22, 1966 when the still pending State action was instituted against Tidewater alone.[7] Fur-

7. Delta did write a letter of protest to Tidewater after that company had commenced the drilling of a well on the land, which was followed by discussions be-

ther, neither John E. Pottharst nor the Delta—Pottharst Group have ever taken any administrative action before the Secretary of the Interior to challenge the validity of the mineral reservation that was incorporated in the Pottharst patent.

On the date of the filing of the present suit, Getty and Gulf had expended slightly less than $2.5 million in connection with their drilling and producing operations under the federal lease. Substantial royalties have been paid to the United States and such royalties are still accruing.

## THE DETERMINATION THAT THIS LAND WAS VALUABLE FOR MINERALS

The Delta—Pottharst Group assert that John E. Pottharst acquired title to this land, or at least vested rights in it, on February 28, 1947 when Assistant Secretary Gardner approved the classification of the land for sale. They contend that Pottharst had previously deposited with the Government the purchase price of the land and that the contract of sale became complete when it was classified for sale. Alternatively, they argue that the certificate of March 25, 1947 vested complete title in Pottharst and that a formal patent was not necessary since it was not specifically provided for in the 1884 Act. With respect to the question of whether the property was determined to be valuable for minerals, it is argued that the Muck memorandum which was referred to in the classification by Secretary Gardner should be disregarded since it was not included in the body of the classification; it is suggested that the court ignore the mineral waiver signed by John E. Pottharst in which he agreed that the mineral rights would be reserved by the United States under the 1914 statute; and finally it is contended that the stamped notation on the certificate which referred specifically to the 1914 Act should be disregarded since it was the notation normally placed

on the original application rather than the one customarily used for a certificate.

The court cannot accept these technical arguments of the defendants. It should first be said that the evidence is overwhelming that these lands were in fact determined to be valuable for minerals prior to the first date on which the defendants claim Pottharst acquired vested rights in the land, this being the classification for sale that was made on February 28, 1947. There has previously been recited the numerous steps that were taken to investigate the mineral possibilities, which included a field trip by representatives of the Interior Department and the three separate recommendations that the mineral rights be reserved to the United States in any sale of the land. To hold that Secretary Gardner approved the sale of the property without any provision for reserving the minerals would be to charge that official with having committed a fraud upon the United States. The pleadings make no such charge and, in any event, it would not be justified. The Secretary of the Interior had undoubtedly determined that these lands had mineral value so as to require the reservation of the mineral rights by the United States prior to the time that the land was classified for sale.

Defendants also contend that even if the Secretary in fact made the mineral classification, he employed erroneous tests for that determination and that the evidence was insufficient to support it. Defendants are here challenging a factual determination made by the Secretary many years ago. Public land law dictates that any question of fact decided by the Secretary is conclusive and is not open to relitigation in the courts. Burfenning v. Chicago, St. P., M. & O. Ry. Co., 163 U.S. 321, 16 S.Ct. 1018, 41 L.Ed. 175 (1896); DeCambra v. Rogers, 189 U.S. 119, 23 S.Ct.

tween the attorneys for both parties. However, Delta took no further action until the 1966 suit was filed. At that

time, Delta was asserting a different legal theory than those advanced in this suit.

519, 47 L.Ed. 734 (1903); St. Louis Smelting and Refining Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875 (1882).

In arguing against giving any legal effect to the mineral classification, defendants rely upon Burke v. Sou. Pacific R. R. Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914). Defendants urge that under *Burke*, the mineral reservation in the Pottharst patent must be ignored and regarded as not written. *Burke* is inapposite. It involved a direct statutory railroad grant in which the statute specifically excluded mineral lands (not mineral rights) from its effect. When the *Burke* patent was issued, the 1914 Act was not in existence and therefore the Secretary had the option of either conveying the lands with the minerals or, as to any lands known to have mineral value, to exclude them entirely from the sale. The *Burke* patent did not contain a specific mineral reservation but there was incorporated therein only a general clause providing that "excluding and excepting all mineral lands, should any be found, in the tracts aforesaid." The Court's decision was based on the assumption that the Interior Department had not made any investigation of the mineral character of the land and since they were included in the patent, it was forced to assume that they were nonmineral in character. In this case, the opposite is true; the Interior Department made several specific determinations of the mineral value of the Pottharst lands before Pottharst acquired his rights.

■ The defendants contend that Pottharst acquired vested rights in this property by the mere classification of it for sale. On this point it must again be pointed out that this land was not conveyed under a statutory or *in praesenti* grant, but rather the sale was made under a permissive statute which gave the Secretary discretionary authority to sell or not sell. In this situation, the classification represented only the tentative decision of the Secretary to sell, and Pottharst as the applicant acquired no vested rights against the United States through the classification. Hutchings v. Low, 15 Wall. 77, 82 U.S. 77, 21 L.Ed. 82 (1873); Lewis v. Udall, 374 F.2d 180 (9th Cir. 1967).

■ While it may be unnecessary to consider the point, the same conclusion must be reached as to the alternative contention of the Delta—Pottharst Group that the certificate of March 25, 1947 conveyed complete title to Pottharst with the mineral rights. Factually, when this certificate was issued, the mineral determination had been made, Pottharst had signed the mineral waiver formally agreeing to the reservation of the minerals by the Government and, as previously noted, the certificate itself contained the stamped notation that the sale was made subject to the 1914 statute.[8] Whatever rights Pottharst may have acquired through the certificate clearly were subject to the provision for reservation of mineral rights by the United States from the formal sale. Here again, however, the court finds that Pottharst did not gain title to the land through the certificate and that this was accomplished only by the patent, which admittedly contained a formal reservation of the minerals in favor of the Government. Insofar as the statutes involved in this case are concerned, only the patent conveyed formal title from the United States to Pottharst. Carter v. Ruddy, 166 U.S. 493, 17 S.Ct. 640, 41 L.Ed. 1090 (1897); Wilcox v. Jackson ex dem. McConnel, 13 Pet. 498, 38 U.S. 498, 10 L.Ed. 264 (1839); Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1899); St. Louis Smelting & Refining Co. v. Kemp, *supra*. In *Carter*, the rule was applied to a statute which, like the

---

8. Defendants argue that since this was the wrong stamp, it was not even admissible in evidence. The notation is one specifically provided for in the regulations of the Secretary and, necessarily, it is valid evidence. While it was not the one customarily placed on certificates, it unquestionably reflected the decision of the Secretary to reserve the minerals under the 1914 Act.

1884 Act, did not specifically provide for a patent. In that case the Court said:

"＊ ＊ ＊ While it is true that the act of 1854 does not in terms provide for the issue of a patent, and simply authorizes the location of the scrip upon any public lands, yet the general rule is that a patent is necessary for the transfer of the legal title to public lands.

＊ ＊ ＊ ＊ ＊ ＊

"＊ ＊ ＊ It is enough that there is nothing to exempt this case from the ordinary rule that a patent is necessary to convey the legal title; that the certificate of location created, at best, but an equitable title; and that such a title is not sufficient to sustain an action of ejectment in the federal courts." 166 U.S. at 495, 496, 17 S.Ct. at 641, 642.

If any question existed originally with respect to the need for a formal patent, it was settled by the 1914 Mineral Reservation Act. That statute specifically calls for the issuance of a patent, subject to the mineral reservation in favor of the United States.[9]

The court therefore finds that on all pertinent dates the mineral determination had been made with respect to this property, and there remains only the question of determining whether the 1914 statute, requiring the reservation of the minerals in such cases, was applicable to the Pottharst sale.

### THE 1884 STATUTE MUST BE CONSTRUED WITH THE 1914 MINERAL ACT IN CONSIDERING THE MINERAL RESERVATION CONTAINED IN THE POTTHARST PATENT

 The Delta—Pottharst Group contend that since these properties originally were part of a military reservation, they lost permanently their status as public lands of the United States and that therefore the 1914 mineral statute was inapplicable to the Pottharst sale. Defendants cite Wilcox v. Jackson, 13 Pet. 498, 38 U.S. 498, 10 L.Ed. 264 (1839) and United States v. O'Donnell, 303 U.S. 501, 58 S.Ct. 708, 82 L.Ed. 980 (1938) as authority for their position. These cases stand for the proposition that so long as lands reserved for some special purpose are still affected by the reservation, they are not subject to the general land laws of the United States. In this case, however, the military reservation was formally abandoned in 1886. When that abandonment occurred, the property again became part of the public lands of the United States and was subject to disposition under any of the general land laws enacted after that date. Northern Lumber Co. v. O'Brien, 139 F. 614 (8th Cir. 1905); Bardon v. Northern Pacific R. Co., 145 U.S. 535, 12 S.Ct. 856, 36 L. Ed. 806 (1892); Frost v. Wenie, 157 U.S. 46, 15 S.Ct. 532, 39 L.Ed. 614 (1895); Anderson v. McKay, 94 U.S.App. 11, 211 F.2d 798 (1954). One such law in effect when the Pottharst sale was made was of course the 1914 statute which required that once a mineral determination is made, the mineral rights must be reserved from any sale made by the United States.

 Section 5 of the 1884 Act appears to be in harmony with the 1914 statute. Section 5 provides that any lands proven to be valuable for minerals must be disposed of "exclusively under the mineral land laws of the United States." The 1914 Act, clearly a "mineral land law" in turn provides:

"Lands ＊ ＊ ＊ valuable for those deposits, shall be subject to ＊ ＊ ＊ purchase, if otherwise available, under the nonmineral land laws of the United States." (Such purchase to be subject

---

9. Section 3 of the 1914 Act, 30 U.S.C. § 123, provides in part that "Any person who ＊ ＊ ＊ shall locate, select, enter or purchase, after July 17, 1914, under the nonmineral land laws of the United States, any lands ＊ ＊ ＊ [which are later reported or classified as being valable for minerals] may ＊ ＊ ＊ *receive a patent therefor, which patent shall contain a reservation to the United States* ＊ ＊ ＊ [of all pertinent mineral deposits.]." (Emphasis added.)

of course to the mineral reservation by the United States.)

By the express terms of the two statutes, therefore, one being a nonmineral land law and the other a mineral land law, the Pottharst sale was properly made under the 1884 Act, subject to the mineral reservation requirement of the 1914 statute.[10]

If any question existed concerning the interpretation of the two statutes, it was removed by Section 7 of the Taylor Grazing Act, as amended in 1936. This land had been withdrawn by Executive Order 6964, and the amendment of Section 7 of the Taylor Grazing Act authorized the Secretary to classify the land for sale "under applicable public land laws, * * *" The Pottharst application was processed and classified under Section 7 of the Taylor Grazing Act and, acting under its terms, the Secretary determined that the United States could make a private sale of these lands under the 1884 Act so long as the valuable minerals thereunder were reserved to the Government under the 1914 statute. This procedure was followed by the Secretary, and the sale to Pottharst with the mineral reservation was in accordance with the statutory directions of Congress.

The Delta-Pottharst Group assert that Section 5 of the 1884 Act (providing for the exclusive disposition of the property under the mineral land laws of the United States) referred only to the mineral land laws that were in existence when the statute was passed, i. e., the placer mining laws under which a claimant could have obtained complete fee title to land known to be valuable for minerals. The construction contended for by defendants is contrary to several decisions construing statutes that dealt with "minerals" or "mineral laws." Many courts have applied subsequent legislation in construing statutes of this kind. Northern Pacific R. R. Co. v. Sanders, 166 U.S. 620, 17 S.Ct. 671, 41 L.Ed. 1139 (1897); Northern Pacific R. R. Co. v. Soderberg, 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575 (1903) [and 104 F. 425 (9th Cir. 1900)]; Nelson v. Northern Pacific R. R. Co., 188 U.S. 108, 23 S.Ct. 302, 47 L.Ed. 406 (1903); West Coast Exploration Co. v. McKay, 93 U.S.App.D.C. 307, 213 F.2d 582 (1954), cert. denied, 347 U.S. 989, 74 S.Ct. 850, 98 L.Ed. 1123 (1954); Anderson v. McKay, 94 U.S.App. D.C. 11, 211 F.2d 798 (1954), cert. denied, 348 U.S. 836, 75 S.Ct. 51, 99 L.Ed. 660 (1954). Also, the argument of the defendants ignores the historical development of the concept that the United States should and must reserve its mineral wealth and administer these properties through a system of leasing rather than outright divestiture. As to petroleum resources, this policy culminated in the passage of the Mineral Reservation Act of July 17, 1914 and the Mineral Leasing Act of February 5, 1920.

This rule was enunciated in the *Anderson* case where the Court held that the 1914 statute under consideration here cut across the provisions of an earlier statute. This was said by the Court:

"So in this case, so far as the 1914 Act is concerned, we think it sharply restricted all patent rights which had theretofore existed, but had not been exercised, in respect to lands reported to be valuable for certain mineral deposits.

\* \* \* \* \* \*

"Even if the 1887 Act were held to eliminate the mineral land exclusion from patentability, the requirement for a patent still remained, and the Secretary had to pass upon the application.

---

10. Defendants' contention that the 1884 Act provided the exclusive method of selling abandoned military reservation lands and that the 1914 Act cannot be invoked must also be rejected. As previously noted, the 1884 Act was only a permissive one which could be used by the Secretary at his discretion. In this respect, the Act is different from the statutes construed in Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922); West v. Work, 56 App.D.C. 191, 11 F.2d 828 (1926); and Clark v. Herington, 186 U.S. 206, 22 S.Ct. 872, 46 L.Ed. 1128 (1902), which clearly provided the exclusive method of selling the lands affected by them.

And in the meantime, in 1914, before any application was filed, Congress imposed a new restriction upon patents to mineral land. That, too, was a matter for the Secretary to pass upon." 211 F.2d at 803, 807.

The court holds, therefore, that the 1914 Act required that the mineral rights be reserved from the Pottharst sale and that this reservation was validly made.

## THE RULE OF CONSISTENT ADMIN- ISTRATIVE CONSTRUCTION

The court's holding that the Government validly reserved the mineral rights in this case is strengthened by the administrative construction that has been given by the Secretary of the Interior to the statutes relating to abandoned military reservation lands since 1914, or some 55 years prior to the filing of this suit.

The defendants' argument in this suit that the 1884 statute provided the exclusive method of disposing of abandoned military reservation properties is contrary to "Instructions" that were issued by the Secretary on January 2, 1914 which are reported in 43 L.D. 33. It was there ruled that such properties could be disposed of without meeting all of the requirements of the Act of July 5, 1884. Then on June 4, 1936, the Interior Department issued additional Instructions which held that lands in abandoned military reservations were included in the withdrawal provided for in Executive Order 6964 and thereafter were subject to classification and disposition under the amended Taylor Grazing Act. This ruling clearly subjected these lands to all public land laws of the United States, including specifically the 1914 Mineral Reservation Act. These instructions were confirmed by two specific but unreported rulings of the Secretary in Henry W. Parrott, A. 24363 and Mrs. Mae E. Burt, A. 24539, these rulings having been made in 1946 and 1947. Finally, the 1936 ruling with respect to the Executive Order and the Taylor Grazing Act was repeated in regulations issued in 1954 which are found in 43 CFR, Part

116. These regulations, also noted that "Most of the lands affected by such regulations have been disposed of."

This consistent administrative position of the Secretary brings into play the legal principle that the courts will generally follow the interpretation given to a statute by the officer or agency charged with its administration, even if that interpretation is not the only reasonable one or possibly is not the result the court would have reached had the question arisen in the first instance in judicial proceedings. McLaren v. Fleischer, 256 U.S. 477, 41 S.Ct. 577, 65 L.Ed. 1052 (1921); United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361 (1930); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Boesche v. Udall, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); Brennan v. Udall, 379 F.2d 803 (10th Cir. 1967), cert. denied 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967). In the *Jackson* case, the rule was stated in the following language:

"It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. [Citing authorities] And such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required." 280 U.S. at 193, 50 S.Ct. at 146.

The Secretary of the Interior for many years prior to issuance of the Pottharst patent had ruled that abandoned military reservation lands are "public lands" of the United States and are subject to the general public land laws including specifically Section 7 of the Taylor Grazing Act. One of these public land laws is the 1914 Act which required that the mineral rights be reserved from the Pottharst patent.

## THE DOCTRINE OF ACQUIESCENCE

Also applicable in this case is the doctrine of acquiescence, which has also been termed laches or administrative

estoppel. This principle has been established both by the courts and by numerous Interior Department rulings for the purpose of insuring an orderly administration of the public land laws of the United States by its executive officers.

In the present case, John E. Pottharst voluntarily signed the mineral waiver in which he consented that the mineral rights be reserved by the United States under the 1914 Act. This followed determination by the Department of the Interior that the lands were valuable for minerals. Thereafter, a formal patent containing the mineral reservation was issued to Pottharst. Pottharst placed this patent of record and, in a subsequent recorded sale to Delta, formally acknowledged that his title had been acquired by the patent and that the mineral rights were outstanding in the United States. The same acknowledgment was made by the Pottharst heirs in the succession of their deceased father. No action has ever been taken by Pottharst or any of the defendants to challenge the mineral reservation in proceedings before the Secretary of the Interior; and except for the 1966 State court suit, no judicial action was attempted by the defendants in the assertion of their claims. In the meantime, bona fide rights in Getty and Gulf were created through the acquisition of the federal lease affecting the property and, as was previously noted, Getty and Gulf have now expended nearly $2.5 million in the mineral development of the property under that lease.

Under these factual circumstances, acquiescence decisions such as Brennan v. Udall, 379 F.2d 803 (1967), cert. denied 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed. 2d 468, are applicable. The court in *Brennan* was confronted with the contention that a mineral reservation should not have been inserted in the patent at all because the entry of the patentee had been made prior to the adoption of the 1914 statute requiring that reservation. In holding that the plaintiff could not belatedly attack the reservation, the court said:

"Prior to submitting his final proof, which was subsequent to the 1916 classification of the land as a valuable source of petroleum and nitrogen, Baxter freely consented that his entry be considered as made under the 1914 Act and that the patent, when issued to him, should contain the reservations provided for in that Act. At that time he had the right to show that the lands were non-mineral in character and receive accordingly an unrestricted patent. Instead, he chose to accept the patent with the reservations, and an attack upon it by his successors in interest almost fifty years after its issuance comes too late." 379 F.2d at 807.

The application of this doctrine by the Interior Department in Conrad Luft, 63 I.D. 46 (1956) is worthy of note. There an unconditional final certificate had been issued to the entryman which did not contain or make any reference to a mineral reservation. The mineral reservation was then erroneously incorporated in the patent. Demand was made by the patentee for a supplemental patent which would exclude the mineral reservation. This was denied by the Solicitor in his ruling where he said:

"In the instant case, the patentee accepted the restricted patent in 1919 without objection, his successors took title with full knowledge of the reservation, and the appellant held the title for 24 years before requesting relief. In the meantime the Department has issued an oil and gas lease for the lands involved."

*Brennan* and *Luft* are typical of the circumstances under which the doctrine of acquiescence is invoked. The present case suggests the need for the application of the principle. Here the defendants and their ancestor, John E. Pottharst, did much more than remain passive without asserting their rights. They took affirmative action in several instances to acknowledge that the mineral rights in this property were outstanding in the United States, and they allowed the bona fide rights of Getty and Gulf to intervene. Even if their technical claims were other-

wise found to be valid, they would be barred to assert them at this late date.

## CONCLUSION

The disposition of the foregoing issues eliminates the need to consider the special pleas urged by the United States and by Getty and Gulf as cross-claimants. The court feels impelled to comment, however, that if necessary, the plea of estoppel would appear to be appropriate here in view of the equities favoring the United States, Getty and Gulf.

Considering the foregoing reasons, which constitute the court's findings of fact and conclusions of law, plaintiff and plaintiffs in cross-claim shall present a final judgment in accordance with the views expressed herein.